**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | No. 1:20-cr-10048-STA |
| | ) | |
| JUSTIN COFFMAN, | ) | |
| | ) | |
| Defendant. | ) | |

---

## MOTION TO SUPPRESS EVIDENCE

---

Comes now the Defendant, **JUSTIN COFFMAN**, [hereinafter "Defendant"], by and through his counsel of record, Alexander David Camp, and pursuant to the Fourth Amendment to the United States Constitution, respectfully moves this Honorable Court to determine the constitutionality of all detentions, searches and seizures, confessions, or admissions and any other matters through which evidence was seized, statements were made, *etc.*, the admissibility of which should be properly determined by the Court prior to the introduction of said evidence or testimony to the Court. Said Motion includes, but is not limited to, any and all evidence and items seized by members of Jackson Police Department ("JPD") and ATF Agents on June 2, 2020, pursuant to the procurement of a search warrant for the search of the Defendant's residence which is located at 1243 Whitehall Street, Lot #4, Jackson, Madison County, Tennessee. More specifically, the Defendant alleges:

1.      That on June 2, 2020, Major Phillip Kemper, [hereinafter "Kemper"], who is an Investigator with the Jackson Police Department, presented an Affidavit for Search Warrant, [hereinafter Affidavit], to Judge Roy Morgan with the Circuit Court of Madison County,

1

Tennessee, for the search of the Defendant's residence located at 1243 Whitehall Street, Lot #4, Jackson, Madison County, Tennessee. See attached Exhibit 1. The Court issued the Search Warrant, it was executed, and the return thereon was made that same day. See attached Exhibit 2.

2.      That the Defendant has standing to contest this search in that the search was conducted at his residence. The Fourth Amendment to the U.S. Constitution protects a citizen from unreasonable searches and seizures.  The legitimate expectation of privacy in the home exists whether a person owns or rents the home. *United States v. Hyson*, 721 F.2d 856, 859 (1st Cir. 1983); United States v. Ayoub, 498 F.3d 532,539 (6th Cir. 2007).

3.      That the factual circumstances in support of the search describe events that took place over a period of five (5) days before the search was conducted. The Affidavit indicates that a Facebook post was discovered on a musical band, ("The Gunpowder Plot's") profile page by an Officer with the Jackson Police Department.  That the Affidavit states, "[P]ictures posted to Facebook *suggesting an improvised* explosive incendiary type device (commonly referred to as a Molotov cocktail) being deployed in the City of Jackson." Exhibit 1, page 1.  Here, Kemper seemingly concedes that this "device" was both suggestive and improvised.  The Affidavit reads further to identify that the picture was posted on a Facebook page known as "The Gunpowder Plot," and included another Facebook page identifying Justin Coffman.

In furtherance of the "Investigation," on the following day, another JPD officer, Chestnut, spoke to a tattoo artist about Justin Coffman.  The officer asked the tattoo artist to inform the Defendant to call the officer.  The Defendant called and explained to the officer that that the "Molotov Cocktail" was in fact *suggestive and improvised,* because it was a "bottle that contained apple juice." See Exhibit 1, page 2.  The Defendant further stated that this picture was

posted to his Facebook musical band's profile page – The Gunpowder Plot, and shared by the Defendant in support of his upcoming album release. Furthermore, though not stated in the Affidavit, the quoted caption within the picture contained lyrics of a song that the Defendant had written and recorded in said album. In addition, the Affidavit provided no reason for the officers to believe anything other than what the Defendant informed them.

The Affidavit traverses forward to an event three (3) days after the Facebook picture was posted. The Oak Court Mall and Downtown Jackson, Tennessee hosted a peaceful protest concerning the events of police brutality in the George Floyd murder. The Defendant was present and participated in the gathering in support of the movement. It is alleged that the Defendant is observed with the "appearance" of Nazi/White Supremacist symbols on his jacket; however, there is no actual proof corroborating this evidence. In fact, this jacket was recovered from the Defendant's house which showed "Anti-Nazi" symbols, suggesting a mischaracterization alleged to the Judge in the Affidavit. Exhibit 3, Photograph. The next day, June 1, 2020, the Jackson Sun displayed a photograph showing the Defendant at the peaceful protest and referring to him by his stage musical artist name – "Robert Catesby." Again, similar to the omission of the meaning of the "Gunpowder Plot," there is no reference mentioned to the significance of Robert Catesby pertinent to Justin Coffman. Instead, Kemper provides in the Affidavit a history lesson of a Robert Catesby from England in the 1600's. This figure was alleged to attempt to blow up the House of Lords.

With these facts alleged, Kemper concludes that his investigation yielded as follows: "it appears Justin Wade Coffman uses the name Robert Catesby and The Gunpowder Plot as well as the visual pictures of improvised explosive incendiary devices as symbolism in his threatening

3

Facebook post of impending criminal arson." However, the truth is that the Defendant is in a

Rock band known as the "Gunpowder Plot," he goes by the alias in his band as "Robert

Catesby," and is holding a bottle of Apple Juice in a Facebook post promoting his Rock Album,

to which he advised a JPD officer of its intention. There is nothing to indicate impending

criminal arson. In fact, there is not even a targeted victim of this baseless conclusion reached by

Kemper.

   4. That moreover, the Affidavit setting forth Kemper's assertions failed to address

specifically why there was probable cause to believe that evidence of a crime *was present in the*

*Defendant's residence. See* <u>United States v. Weaver</u>, 99 F.3d 1372, 1378 (6th Cir. Tenn. 1996),

in which the United States Court of Appeals for the Sixth Circuit decried the use of generalized

boilerplate recitations *"which are designed to meet all law enforcement needs for illustrating*

*certain types of criminal conduct."* The Court denounced such language as "engendering the risk

that insufficient 'particularized facts' will be presented for a magistrate to determine probable

cause as opposed to sufficient factual assertions . . . which are an 'honest and straightforward

recitation unadorned by the boilerplate so frequently and woodenly inserted to satisfy Fourth

Amendment standards in the most artificial fashion,'" as follows:

>    **An affidavit that states suspicions, beliefs, or conclusions, without**
> **providing some underlying factual circumstances regarding veracity,**
> **reliability, and basis of knowledge, is a 'bare bones' affidavit.** See <u>Aguilar</u>, 378
> U.S. at 114. In determining whether an affidavit is 'bare bones,' the reviewing court
> is concerned exclusively with the statements contained within the affidavit itself.
> <u>Whiteley</u>, 401 U.S. at 564-65; <u>United States v. Hatcher</u>, 473 F.2d 321, 323 (6th Cir.
> 1973). As we are aware that 'affidavits are 'normally drafted by nonlawyers in the
> midst and haste of a criminal investigation,'' we remain cautious not to interpret
> the language of affidavits in a 'hypertechnical' manner. <u>Pelham</u>, 801 F.2d at 878
> (citing <u>United States v. Ventresca</u>, 380 U.S. 102, 108-09, 13 L. Ed. 2d 684, 85 S.
> Ct. 741 (1965)). **Nevertheless, it is imperative that affidavits accurately reflect**
> **the facts of the particular situation at hand.** <u>United States v. Richardson</u>, 274

U.S. App. D.C. 58, 861 F.2d 291, 294-95 (D.C. Cir. 1988), cert. denied, 489 U.S. 1058, 103 L. Ed. 2d 593, 109 S. Ct. 1325 (1989). **The use of generalized boilerplate recitations designed to meet all law enforcement needs for illustrating certain types of criminal conduct engenders the risk that insufficient 'particularized facts' about the case or the suspect will be presented for a magistrate to determine probable cause. See <u>In re Young</u>, 716 F.2d 493, 500 (8th Cir. 1983) (holding unacceptable an FBI affidavit of 'broad, boilerplate statement describing in a general way' applications, reports, and records commonly kept in bail bond operation);** see also <u>United States v. Barham</u>, 595 F.2d 231, 246 (5th Cir. 1979), cert. denied, 450 U.S. 1002, 68 L. Ed. 2d 205, 101 S. Ct. 1711 (1981) (characterizing sufficient affidavit as 'honest and straightforward recitation (unadorned by the boilerplate so frequently and woodenly inserted to satisfy Fourth Amendment standards in the most artificial fashion)'). . . (Footnotes omitted). (Emphasis added).

5.      The Defendant's Facebook post is protected by his First Amendment right

to free speech.  That the First Amendment states as follows: "Congress shall make

no law respecting an establishment of religion, or prohibiting the free exercise

thereof; or abridging the freedom of speech, or of the press; or the right of the

people peaceably to assemble, and to petition the Government for a redress of

grievances."  The post did not implicitly or explicitly encourage lawless action or

violence; there is nothing to support that the Defendant demonstrated intent for

his speech to result in violence or lawless action; nor was there a likely imminent

use of violence or lawless action as a result of his post.  In <u>Brandenburg v. Ohio</u>,

395 U.S. 444, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969), the Court recognized "the

principle that the constitutional guarantees of free speech and free press do not

permit a State to forbid or proscribe advocacy of the use of force or of law

violation except where such advocacy is directed to inciting or producing

imminent lawless action and is likely to incite or produce such action." <u>Id</u>. at 447.

"The Brandenburg test precludes speech from being sanctioned as incitement to

riot unless (1) the speech explicitly or implicitly encouraged the use of violence or

lawless action, (2) the speaker intends that his speech will result in the use

of violence or lawless action, and (3) the imminent use of violence or lawless

action is the likely result of his speech." Bible Believers v. Wayne Cty., Mich.,

805 F.3d 228, 246 (6th Cir. 2015) (en banc) (footnote omitted).

> "The only references to violence or lawlessness on the part of the Bible
> Believers were messages such as, "Islam is a Religion of Blood and
> Murder," "*Turn or Burn*[1]," and "Your prophet is a pedophile." These
> messages, however offensive, do not advocate for, encourage, condone, or
> even embrace imminent violence or lawlessness. Although it might be
> inferred that the Bible Believers' speech was intended to anger their target
> audience, the record is devoid of any indication that they intended
> imminent lawlessness to ensue. Quite to the contrary, the Bible Believers
> contacted Wayne County prior to their visit, requesting that the [Wayne
> County Sheriff's Office] keep the public at bay so that the Bible Believers
> could "engage in their peaceful expression." Bible Believers, 805 F.3d at
> 244. (emphasis added).
>         Thus, again, in Bible Believers, we see the court examining
> the words used by the speaker. Upon examining the words, the court
> found first, that they did not specifically advocate violence; and second,
> that any inference that might have been drawn from the offensive
> and violence-inciting tendency of the words' content and context was
> negated by other circumstances. The same result obtains here. Just as the
> Bible Believers took reasonable measures to ensure peaceful
> communication of their ideas and prevent violence, Trump's speech itself
> included express disavowal and discouragement of violence. citing
> Nwanguma v. Trump, 903 F.3d 604, 612 2018 U.S. App. LEXIS 25686,
> 2018 FED App. 0202P (6th Cir.).

The Defendant, in sync with the Trump case, denounced any intent of violence-

inciting tendency.  When confronted by Officer Chestnut on the phone, he advised

that the improvised bottle was a makeshift used merely as a prop for his musical

---

[1] The Defendant's Facebook post, (as shown in Exhibit 1 attachment) quotes a lyric to his music
stated, "[Y]ou will bathe in the flames born from your hatred."  It is important to note that this
post was not directed at anyone specific.  Nor does it advocate for, encourage, condone or even
embrace imminent violence or lawlessness.

band's album cover.  From this explanation, he denounced any intent to orchestrate violence, or incite any imminent threat or lawless action.

6.      That no corroborative surveillance of the Defendant's residence was conducted by Kemper, (nor any other law enforcement officer), to establish why what was discovered on a Facebook post, was in any way indicative evidence of criminal activity being located within his residence.  There was nothing to support or show when the actual photograph was taken prior to posting it to Facebook.  Beyond the boilerplate language contained within the Affidavit, Kemper set forth nothing establishing if, or why, there was probable cause to believe that the Defendant possessed anything at his residence which the Search Warrant commanded to be seized.

7.      That there was also no allegation within the Affidavit that Kemper possessed any information establishing that there was any criminal activity consistent with the possession of a "hoax device" or "otherwise actual improvised explosive incendiary device," which had in the past, or was currently occurring at the Defendant's residence. The Affidavit made an unsubstantiated leap from a Facebook Musical Band profile post, to conclude baseless speculation that evidence of criminal activity would be found at the Defendant's residence.

8.      A warrant may only issue upon showing to a neutral magistrate that probable cause exists to support the proposed search.  Probable cause has been described as "fair probability that contraband or evidence of a crime will be found at a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).  That without approaching a "hypertechnical judicial review of the affidavit," as "tend[ing] to demean our system of justice and to weaken society's confidence in it," a "plain reading of the affidavit," fails the totality of the circumstances test for a probable cause finding necessary to issue a search warrant as set forth by the United States Supreme Court

7

in <u>Illinois v. Gates</u>, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

9.     That the *Gates* case illustrates a search warrant's requirements:

> **Before a search warrant is issued, the issuing magistrate must make a practical, common sense decision as to whether, given all of the circumstances set forth in the affidavit, that there is a reasonable probability that evidence of a crime will be found in a particular place.** <u>Illinois v. Gates</u>, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983); <u>United States v. Ventresca</u>, 380 U.S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741 (1965).

10.     Here, the Affidavit only alleges events that took place outside of the home, or on a Facebook post.  That the Sixth Circuit in <u>United States v. Gunter</u>, 266 Fed. Appx. 415, 418-419, 2008 U.S. App. LEXIS 4225, *7-10, 2008 FED App. 0110N (6th Cir. 2008), discussed the requirement of *reliable* evidence connecting the criminal activity of a known drug dealer, with his residence in order for the nexus between the two to be established to satisfy the probable cause requirements of the Fourth Amendment under the totality of the circumstances test set forth in <u>Illinois v. Gates</u>:

> Defendant next argues that, as the warrant affidavit only described drug sales outside his residence, it failed to establish a sufficient nexus between his illegal activity and his residence to allow a search of that residence. See <u>Frazier</u>, 423 F.3d at 532.'There must be a 'nexus between the place to be searched and the evidence to be sought.'' (quoting <u>United States v. Carpenter</u>, 360 F.3d 591, 594 (6th Cir. 2004)). **To establish such a nexus, a warrant application must show more than just that "the owner of the property is suspected of crime," but instead must establish "that there is reasonable cause to believe that the specific "things' to be searched for and seized are located on the property to which entry is sought.'** <u>Zurcher v. Stanford Daily</u>, 436 U.S. 547, 556, 98 S. Ct. 1970, 56 L. Ed. 2d 525 (1978). The mere fact that someone is a drug dealer is not alone sufficient to establish probable cause to search their home. See <u>Frazier</u>, 423 F.3d at 533. (Emphasis added)..

11.     That in <u>United States v. McPhearson</u>, 469 F.3d 518, 524 (6th Cir. Tenn. 2006), the Sixth Circuit held:

> "For the magistrate to be able to properly perform this official function, the

affidavit presented [in support of the search warrant] must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." Weaver, 99 F.3d at 1376. The affidavit must contain particularized facts demonstrating "a fair probability that evidence of a crime will be located on the premises of the proposed search." Frazier, 423 F.3d at 531. This requires "a nexus between the place to be searched and the evidence sought." United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004) (*en banc*) (internal quotation omitted). In other words, the affidavit must suggest "that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought" and not merely "that the owner of property is suspected of crime." Zurcher v. Stanford Daily, 436 U.S. 547, 556, 98 S. Ct. 1970, 56 L. Ed. 2d 525 (1978). . . .

''[A] suspect's mere presence or arrest at a residence is too insignificant a connection with that residence to establish that relationship' necessary to a finding of probable cause.' United States v. Savoca, 761 F.2d 292, 297 (6th Cir. 1985) (quoting United States v. Flores, 679 F.2d 173, 175 (9th Cir. 1982)).

12.    The search of the Defendant's residence was stale in that it took place five (5) days after the Facebook post.  Information supporting the warrant must be current enough to demonstrate that probable cause exists at the time of the proposed search. If the information in an affidavit is too dated to support probable cause it is described as stale.  In *United States v. Button*, 653 F.2d 319 (8th Cir. 1981) an affidavit indicating marijuana was in a certain building one day was stale when the information was eight days old.

Passage of time between discovery of facts establishing probable cause and the application for a search warrant, absent an updating of facts or explanation for the delay, may preclude a finding of probable cause. *See, United States v. Neal*, 500 F.2d 305 (10th Cir. 1974). The affidavit must allege that the contraband sought to be seized or the illegal activity in question exists at the moment the search warrant is to be issued.  *Sgro v. United States*, 287 U.S. 206, 210-12, 53 S. Ct. 138, 142, 77 L.Ed. 260 (1932).

The fact that five (5) days elapsed between the date of the Facebook post – initiating the "investigation," and the execution of the search warrant of the Defendant's residence, precludes

a finding of probable cause.  There is not even an indication as to when the actual photograph

was taken.  The information was stale and as such should not have been permitted to establish

the requisite probable cause to permit the issuance of a search warrant taking place five (5) days

after the Facebook post was made.  There was no basis to believe that the alleged contraband was

still at the residence given the passage of time.  The actions of law enforcement in obtaining a

search warrant based on stale and inaccurate information is a violation of the privacy rights

afforded to the Defendant under the Fourth Amendment to the United States Constitution.

13.  In United States v. Leon, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984),

the Supreme Court held that the exclusionary rule, which suppresses illegally obtained evidence,

does not apply where the evidence was discovered pursuant to a search warrant that was issued

in good faith. Id. at 922 (concluding that "the marginal or nonexistent benefits produced by

suppressing evidence obtained in objectively reasonable reliance on a subsequently

invalidated search warrant cannot justify the substantial costs of exclusion"). In reaching that

holding, the Supreme Court acknowledged four exceptions to the good-faith rule:

1) the supporting affidavit contains information the affiant knew or should have known is false;

2) the issuing magistrate lacked neutrality and detachment; 3) the affidavit is devoid of

information that would support a probable cause determination making any belief that probable

cause exists completely unreasonable; or 4) the warrant is facially deficient.

Czuprynski, 46 F.3d at 563-64; see also Leon, 468 U.S. at 905, 914-15, 922-23; Weaver, 99 F.3d

at 1380; Leake, 998 F.2d at 1366. Thus, in each of those situations, illegally obtained evidence

will be subject to suppression, even though a search warrant was issued.

14.  Here, the Affidavit fails under the third exception to the Leon rule. To fit that

exception, the executing officer must have "no reasonable grounds for believing that

the warrant was properly issued." <u>Leon</u>, 468 U.S. at 923; <u>see also Leake</u>, 998 F.2d at 1366.

Moreover, the objective reasonableness determination does not examine the subjective states of

mind of law enforcement officers, rather it inquires "whether a reasonably well-trained officer

would have known that the search was illegal despite the magistrate's decision." <u>Leon</u>, 468 U.S.

at 923 n.23; <u>see also Allen</u>, 211 F.3d 970, 977 (Gilman, J., concurring).

      The application of the third Leon exception is governed by whether the investigating

officers' conduct was objectively reasonable.  Here, where the affidavit does not establish

probable cause, the third Leon exception turns on whether a reasonable officer would know that

the affidavit failed to establish probable cause. In light of the particular deficiencies with the

Affidavit, the following inquiry is made: [W]hether a reasonable officer would believe that the

affidavit established probable cause to search the residence.

      In <u>United States v. Helton</u>, 314 F.3d 812, 824-825, 2003 U.S. App. LEXIS 66, 2003 FED

App. 0003P (6th Cir.), the Sixth Circuit analyzed this inquiry:

> "[K]nowing that FBI-A's statements should be heavily discounted, no reasonable officer
> would believe that the Howard affidavit established probable cause to search the 723 N.
> Harrison Street residence. As discussed above, with FBI-A's statements receiving little
> weight, the other allegations in the Howard affidavit do not suffice to establish probable
> cause. A reasonable officer knows that evidence of three calls a month to known drug
> dealers from a house, a description of that house, and an allegation that a drug dealer
> stores drug proceeds with his brother and his brother's girlfriend (neither of whom live at
> or are known to visit that house), falls well short of establishing probable cause that the
> house contains evidence of a crime. Moreover, because FBI-A's statements are heavily
> discounted due to their minimal trustworthiness and reliability, they add little to the
> probable cause determination. Thus, a reasonable officer would recognize that without
> more corroboration, the Howard affidavit came well short of establishing probable cause.
> For that reason, the third exception to the Leon rule applies and the evidence obtained
> from the search of the 723 N. Harrison Street residence should have been suppressed."
> There is no evidence in the Affidavit to support probable cause that a crime of arson is

being committed or even threatened at the Defendant's home. Officers, including Kemper, were aware that the Defendant was a musician in a band. Furthermore, officers were aware of the band's name, the Defendant's stage name, and the purpose of his Facebook post supporting his album. Officers nevertheless confronted the Defendant about the suggestive and improvised bottle, to which he explained its intended use as a prop containing apple juice. In addition, the Affidavit provided no reason for the officers to believe anything other than what the Defendant informed them. To which he also disavowed any intent to cause harm or imminent threat of violence. A reasonable officer would believe in the application of the First Amendment of the United States Constitution and understand that that would provide sufficient probable cause to support searching the Defendant's residence.

15.     That the subsequent use of evidence seized, and information obtained, by reason of the execution of a fatally defective Search Warrant issued upon an Affidavit lacking the probable cause requirements mandated by the Fourth Amendment through which the alleged facts failed to connect a crime or criminal activity to the premises to be searched constituted "fruit of the poisonous tree. "Under the "fruit of the poisonous tree" analysis, the focus is on whether the evidence was obtained by exploitation of the Fourth Amendment illegality. Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441 (1963)." "[G]ranting establishment of [that] primary illegality, the evidence to which [this] objection is made has . . . come . . . by exploitation of that illegality [and not] by means sufficiently distinguishable to be purged of the primary taint," *Id*, See also Silverthorne Lumber Company v. United States, 251 U.S. 385, 40 S. Ct. 182, 64 L. Ed. (1920).

16.     That all evidence acquired by reason of the above-referenced June 2, 2020, Search

Warrant should be suppressed after the Court conducts an evidentiary hearing wherein the Defendant may impeach the Affidavit supporting the Search Warrant issued for and executed upon his residence.

17.     That the exclusionary rule exists for more than one reason. As stated by the United States Supreme Court in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968):

> **The Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions. Thus, in our system, evidentiary rulings provide the context in which the judicial process of inclusion and exclusion approves some conduct as comporting with constitutional guarantees and disapproves other actions by state agents. A ruling admitting evidence in a criminal trial, we recognize, has the necessary effect of legitimizing the conduct which produced the evidence, while an application of the exclusionary rule withholds the constitutional imprimatur. (Emphasis added).**

18.     That the rule also exists for the purpose "'of assuring the people—all potential victims of unlawful government conduct—that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government." United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (dissent). While at first blush this may appear to be merely a statement of the deterrent function, this is not the case, for the focus is on the effect of exclusion upon the public rather than the police. This purpose also has solid credentials in the cases. As early as Weeks v. United States, 232 U.S. 383, 34 S. Ct. 341, 58 L.Ed. 652 (1914)], the Court declared:

> The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures … should find no sanction in the judgments of the courts, which are charged at all times with the support of the Constitution, and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights.

***To sanction such proceedings would be to affirm by judicial decision a manifest neglect, if not an open defiance, of the prohibition of the Constitution, intended for the protection of the people against such unauthorized action. **80.50**

> **80.50** A related point is made in Sundby, Everyman's Exclusionary Rule: The Exclusionary Rule and the Rule of Law (Or Why Conservatives Should Embrace the Exclusionary Rule), 10 Ohio St.J.Crim.L. 393, 397—98 (2013):
>
>> While the exclusionary rule has been justified in a number of ways over the years, it may be that the concept that best captures why the exclusionary rule has survived for so many years—the competing principle of justice to the idea that "two wrongs don't make a right"—is that at bottom the rule is a fundamental expression of the "rule of law" in the criminal procedure context, or, in more colloquial terms, that "there is a right way and a wrong way" and "the end does not justify the means." The rule of law is, of course, a cornerstone of the American constitutional system and is often expressed through the idea that the United States is "a government of laws, and not of men." And although a broad concept, the rule of law at its most basic embodies the idea that no one is above the law, even those in positions of government authority, and that the legitimacy of our system of laws depends on the ability of ordinary citizens to invoke the law on their behalf in everyday courts.

The same notion is implicit in the Mapp declaration that "no man is to be convicted on unconstitutional evidence." Search and Seizure: A Treatise on The Fourth Amendment; The Exclusionary Rule and Other Remedies § 1.1(f) Origins and Purposes (5th ed.) Wayne R. LaFave, David C. Baum Professor of Law Emeritus and Professor Emeritus in the Center for Advanced Study, the University of Illinois. (Some footnotes omitted). (Emphasis added)

**WHEREFORE, THE DEFENDANT, JUSTIN COFFMAN, PRAYS**:

1.      That the Court suppress and determine the admissibility of all evidence obtained from the Defendant's residence on June 2, 2020, including but not limited to, that evidence which resulted from any searches, seizures, confessions, admissions and any other matters or evidence which came into the possession of any law enforcement agency as the result of the fruits of said searches, seizures, confessions or admissions, the admissibility of which should be properly determined by the Court, prior to the introduction of said evidence or testimony at the

hearing of this matter; and

      2.     That the Court dismiss all charges pending against him in this cause and order the return of all property seized respectively from his residence or otherwise, excluding any property which is illegal to possess by law in which he claims no interest.

      3.     For all such relief both general and specific to which your Defendant may be entitled.

Respectfully submitted,

/s/ Alexander D. Camp_____
Alexander David Camp
Attorney for Justin Coffman
Tenn. B.P.R. No. 035070
403 North Parkway, Suite 201
Jackson, TN 38305
(731) 664-4499
alex@campattorney.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing has been served upon Assistant United States Attorney Hillary Parham via e-file delivery, this 24th day of June, 2021.

/s/ Alexander D. Camp _____
Alexander David Camp, Attorney

# EXHIBIT 1

# AFFIDAVIT FOR SEARCH WARRANT
## STATE OF TENNESSEE
## MADISON COUNTY
### PAGE 1 OF 5

Personally appeared before me, Major Phillip Kemper, who makes oath that he has probable cause for believing and does believe that Justin Wade Coffman (W/M, D. O. B. ████████ A.K.A. Robert Catesby) is in possession of the following described property to-wit: Illegal explosive devices, hoax devices, flammable or combustible materials for use in the construction of explosive or incendiary devices, explosive containers, detonation devices or materials used in the construction a fuse or lighting process, construction materials for hoax devices, records, ledgers, written or digital documents related to the purchase and or construction of prohibited explosive, incendiary, or hoax devices as well as computers, cellphones, or other digital media storage devices in which such documentation could be stored contrary to the Laws of the State of Tennessee, upon the following described property, to-wit: 1243 Whitehall Street Lot # 4 Jackson, Tn. 38301 and any vehicles, garages, sheds, and outbuildings on said property. 1243 Whitehall Street Lot # 4 is a singlewide mobile home located in the Parkway Village trailer park. Parkway Village trailer park is located on Whitehall Street between Dr. F.E. Wright Drive and North Parkway in Jackson Tennessee. The entrance to the complex is marked by a large sign on the west side of Whitehall Street which is green in color with white lettering and numbering and the words Parkway Village as well as 1243 Whitehall St. on it making it plainly identifiable. 1243 Whitehall Street Lot # 4 is further located on the second driveway to the left after turning into the complex from Whitehall Street. 1243 Whitehall Street Lot # 4 is the second mobile home on the right side of the drive which is a dead-end. The mobile home located at 1243 Whitehall Lot # 4 is readily identifiable and marked by having a black number 4 on a white background affixed to the left side of the front door which is located near the center of the mobile home and faces the east. There is also a white square with a black 4 painted on the curb in front of the mobile home. The mobile home is further described as being a single family dwelling made of sheet metal construction which is light grayish in color and having a dark bluish sheet metal underpinning that wraps around the lower portion of the mobile home. The roof is made of sheet metal which is silver in color. The front door to the residence is located near the center of the structure and is bluish gray in color. This address has been confirmed through utilities with Jackson Energy Authority. 1243 Whitehall Street Lot # 4 is situated in the City of Jackson, and Madison County Tennessee and his reason for such belief and the probable cause for such belief are that the Affiant has: been involved in an investigation which began on May 28th 2020 by the Jackson police Department into pictures posted to Facebook suggesting an improvised explosive incendiary type device (commonly referred to as a Molotov cocktail) being deployed in the City of Jackson. The pictures were discovered on May 28th 2020 by Jackson Patrol Officer Hannah Wright.

Initials Affiant _PLK_                    Initials Judge _RBmQ_

# AFFIDAVIT FOR SEARCH WARRANT
## STATE OF TENNESSEE
## MADISON COUNTY
## PAGE 2 OF 5

Officer Wright observed the pictures after they had been posted on the page known as
The Gunpowder Plot as well as the page of a person identifying himself as Justin
Coffman.  Officer Wright passed the pictures on to her supervisor, Sergeant Aubrey
Richardson, who then sent them out in an "officer safety" email to all Jackson Police
Department officers in order for all to be aware of the potential danger associated with
the threat to public safety in our city indicated in the Facebook post.  The Facebook
pictures referenced in this affidavit are attached as Exhibit A.  Upon further investigation
by the department's Criminal Investigations Division, Justin Wade Coffman (W/M, D. O.
B.         A.K.A. Robert Catesby) was positively identified as the person holding the
improvised incendiary device in the pictures posted to the Facebook pages.

     During the investigation at approximately 10:55 am on May 29th 2020, Lieutenant
Chris Chestnut spoke to Jeff Stevens, who is the owner of Tattoo Station located at 115
E. Lafayette St. in Jackson, regarding Justin Coffman.  Mr. Stevens stated that Justin
Coffman was an acquaintance of his and has frequented the business.  Mr. Stevens stated
that Justin Coffman is friends with one of his employees, Scott Futrell.  Lieutenant
Chestnut asked Mr. Stevens if he could contact Justin Coffman and have him call
Lieutenant Chestnut.  At 1:15 pm on Friday May 29th 2020, Lieutenant Chestnut received
a call from 731-616-6906.  The caller verbally identified himself as Justin Coffman.  The
caller stated that he was in fact the person in the photograph on his Facebook page
holding a "Molotov Cocktail".  The caller stated that the bottle contained apple juice and
that the photograph had been taken previously to be used in support of his musical band.

     On the afternoon of Sunday May 31st 2020, while providing for public safety
during citizen lead protest event in the area of the Old Hickory Mall, Metro Narcotics
Investigator Robert Pomoroy visually observed a white male subject riding a one wheeled
skateboard type apparatus at the event wearing the same clothing as was in the pictures
previously disturbed by Sergeant Richardson and immediately recognized the jacket.  The
protest location changed from the Old Hickory Mall area to the downtown Jackson area
near City Hall and the Madison County Courthouse at approximately 6:30 pm.  While on
foot patrol in that downtown area, Sergeant Tommy Ferguson observed the white male
subject riding the one wheeled apparatus and also recognized the clothing from the
pictures previously distributed by Sergeant Richardson and in particularly the appearance
of neo-Nazi / white supremacist type symbols on the jacket worn by the subject.  Major
Phillip Kemper heard the radio transmissions of Investigator Pomoroy and Sergeant
Ferguson as to the description of the subject and visually observed Justin Wade Coffman,
who was wearing the jacket seen in the Facebook photo's, get into the driver's seat of a

Initials Affiant _PLK_                                Initials Judge _____

## AFFIDAVIT FOR SEARCH WARRANT
### STATE OF TENNESSEE
### MADISON COUNTY
### PAGE 3 OF 5

maroon Nissan Altima bearing Tennessee license plate 5R2-3H3, which had been parked on East Baltimore Street, and drive away. The vehicle bearing Tennessee license plate 5R2-3H3 is registered to Justin Coffman at 1243 Whitehall Lot # 4 Jackson, TN 38031. On the morning of June 1st 2020, Major Kemper observed a photographed in an online news article posted by the Jackson Sun in which there was a picture of a white male wearing the clothing in which Justin wade Coffman had been observed in at the protest event on the day prior. The Jackson Sun photograph referenced in this affidavit is attached as Exhibit B. The name associated with the photograph in the Jackson Sun was Robert Catesby. While continuing the investigation into the names Justin Coffman and Robert Catesby, Jackson Police Department Criminal Intelligence Analyst Sarah Webb advised Major Kemper the 17th century historical figure known as Robert Catesby was known as a co-conspirator in a plan to blow up the king of England. Based on the investigation, it appears Justin Wade Coffman uses the name Robert Catesby and The Gunpowder Plot as well as the visual pictures of improvised explosive incendiary devices as symbolism in his threatening Facebook post of impending criminal arson. At approximately 3:50 pm on Monday June 1st 2020, Major Kemper observed the maroon Nissan Altima bearing Tennessee license plate 5R2-3H3 parked in front of the mobile home located at 1243 Whitehall Street Lot # 4 and again at approximately 7:45 pm as well. A records check of Justin Wade Coffman's Tennessee driver's license shows the address listed a s1243 Whitehall Street Lot # 4 Jackson, TN 38301. A records check of Justin Wade Coffman's criminal history shows multiple misdemeanor arrest for alcohol and traffic related offenses.

This Affiant began his career with the Jackson Police Department as a patrol officer in March 2004. He has served on the departments Honor Guard and as a member of the S.W.A.T. unit from 2005-2007. The Affiant was assigned fulltime as an investigator on the Gang Enforcement Team in 2006. After being assigned to the Gang Enforcement Team he attended numerous schools and training seminars pertaining to Organized Crime, Criminal Street Gangs, Firearms and Narcotic Enforcement and Investigations. He has personally led and participated in hundreds of State and Federal investigations involving gangs, drugs, guns, and violent crimes. He has been a Task Force Officer with the U.S. Marshals Service Gulf Coast Regional Fugitive Task Force, and from May 2008 through May 2012, was a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). From 2014 until 2017, the Affiant was assigned as the POST certified "General Departmental Instructor" for the Jackson Police Department and was responsible for all aspects of training at the department. On August 24th 2018, the Affiant was assigned as the Commander of Police Investigative Services and now supervises the Special Operations and Criminal Investigative Divisions

Initials Affiant _PCK_                    Initials Judge

# AFFIDAVIT FOR SEARCH WARRANT
## STATE OF TENNESSEE
## MADISON COUNTY
### PAGE 4 OF 5

The Affiant served on the Board of Directors for the Tennessee Gang Investigators Association as Vice President for the West Tennessee Region from 2013 to 2018. The Affiant is a graduate of the 276th Session of the FBI's National Academy of the department.

Based on this investigation into the Facebook posting of Justin Wade Coffman as well as the Affiants training and experience it appears there is cause to believe that Justin Wade Coffman is in possession of a hoax device or otherwise actual improvised explosive incendiary device in violation of T.C.A. 39-17-1302. **The Affiant therefore asks that a warrant be issued to search the residence to-wit:** 1243 Whitehall Street Lot # 4 Jackson, Tn. 38301 and any vehicles, garages, sheds, and outbuildings on said property. 1243 Whitehall Street Lot # 4 is a singlewide mobile home located in the Parkway Village trailer park. Parkway Village trailer park is located on Whitehall Street between Dr. F.E. Wright Drive and North Parkway in Jackson Tennessee. The entrance to the complex is marked by a large sign on the west side of Whitehall Street which is green in color with white lettering and numbering and the words Parkway Village as well as 1243 Whitehall St. on it making it plainly identifiable. 1243 Whitehall Street Lot # 4 is further located on the second driveway to the left after turning into the complex from Whitehall Street. 1243 Whitehall Street Lot # 4 is the second mobile home on the right side of the drive which is a dead-end. The mobile home located at 1243 Whitehall Lot # 4 is readily identifiable and marked by having a black number 4 on a white background affixed to the left side of the front door which is located near the center of the mobile home and faces the east. There is also a white square with a black 4 painted on the curb in front of the mobile home. The mobile home is further described as being a single family dwelling made of sheet metal construction which is light grayish in color and having a dark bluish sheet metal underpinning that wraps around the lower portion of the mobile home. The roof is made of sheet metal which is silver in color. The front door to the residence is located near the center of the structure and is bluish gray in color. This address has been confirmed through utilities with Jackson Energy Authority. 1243 Whitehall Street Lot # 4 is situated in the City of Jackson, and Madison County Tennessee.

Initials Affiant _PLC_

Initials Judge _/RMR/_

JC-000021

**AFFIDAVIT FOR SEARCH WARRANT**
**STATE OF TENNESSEE**
**MADISON COUNTY**
**PAGE 5 OF 5**

The Affiant therefore asks that a warrant issue to search the premises herein described, either by day or by night where he believes said: Illegal explosive devices, hoax devices, flammable or combustible materials for use in the construction of explosive or incendiary devices, explosive containers, detonation devices or materials used in the construction a fuse or lighting process, construction materials for hoax devices, records, ledgers, written or digital documents related to the purchase and or construction of prohibited explosive, incendiary, or hoax devices as well as computers, cellphones, or other digital media storage devices in which such documentation could be stored contrary to the Laws of the State of Tennessee.

_____
AFFIANT

Sworn to and subscribed before me, this 2nd day of ____June____ ,2020.

_____
JUDGE, CIRCUIT COURT
MADISON COUNTY, TENNESSEE

JC-000022

Exhibit A  


**Justin Coffman**
10 hrs · 🌐                                                    · · ·




**The Gunpowder Plot**                                      👍
10 hrs · 🌐

Was saving these pictures but now seems like a good
time.

"You will bathe in the flames born from your hatred"



Will Burton and 13 others

👍 Like          💬 Comment          ↗ Share

    

JC-000023

Exhibit B 



Robert Catesby rides a onewheelie holding up a sign during the second day protest at Old Hickory Mall , in Jackson, Tenn., Sunday, May 31, 2020. Jackson protests the death of George Floyd, and many other prominent African Americans who were killed by police officers.
STEPHANIE AMADOR / THE JACKSON SUN

JC-000024

# EXHIBIT 2

CIRCLE APPLICABLE SELECTION 1. ORIGINAL   2. RECORD COPY   3. TO BE LEFT WITH PERSON SERVED

STATE OF TENNESSEE
MADISON COUNTY
TO THE SHERIFF OR ANY LAWFUL OFFICER OF SAID COUNTY:

Proof by affidavit having been made before me by Investigator Phillip Kemper, that there is probable cause for believing that the Laws of the State of Tennessee have been and are being violated by Justin Wade Coffman (W/M, D. O. B. ▓▓▓▓ A.K.A. Robert Catesby) by having in his possession: Illegal explosive devices, hoax devices, flammable or combustible materials for use in the construction of explosive or incendiary devices, explosive containers, detonation devices or materials used in the construction a fuse or lighting process, construction materials for hoax devices, records, ledgers, written or digital documents related to the purchase and or construction of prohibited explosive, incendiary, or hoax devices as well as computers, cellphones, or other digital media storage devices in which such documentation could be stored contrary to the Laws of the State of Tennessee, upon the following described property, to-wit: 1243 Whitehall Street Lot # 4 Jackson, Tn. 38301 and any vehicles, garages, sheds, and outbuildings on said property.  1243 Whitehall Street Lot # 4 is a singlewide mobile home located in the Parkway Village trailer park. Parkway Village trailer park is located on Whitehall Street between Dr. F.E. Wright Drive and North Parkway in Jackson Tennessee.  The entrance to the complex is marked by a large sign on the west side of Whitehall Street which is green in color with white lettering and numbering and the words Parkway Village as well as 1243 Whitehall St. on it making it plainly identifiable.  1243 Whitehall Street Lot # 4 is further located on the second driveway to the left after turning into the complex from Whitehall Street. 1243 Whitehall Street Lot # 4 is the second mobile home on the right side of the drive which is a dead-end.  The mobile home located at 1243 Whitehall Lot # 4 is readily identifiable and marked by having a black number 4 on a white background affixed to the left side of the front door which is located near the center of the mobile home and faces the east.  There is also a white square with a black 4 painted on the curb in front of the mobile home.  The mobile home is further described as being a single family dwelling made of sheet metal construction which is light grayish in color and having a dark bluish sheet metal underpinning that wraps around the lower portion of the mobile home.  The roof is made of sheet metal which is silver in color.  The front door to the residence is located near the center of the structure and is bluish gray in color.  This address has been confirmed through utilities with Jackson Energy Authority.  1243 Whitehall Street Lot # 4 is situated in the City of Jackson, and Madison County Tennessee being the premises occupied by Justin Wade Coffman (W/M, D. O. B. ▓▓▓▓ A.K.A. Robert Catesby). situated in Jackson, Tennessee; you are therefore commanded to make immediate search for the person or premises herein above described for the following property: Illegal explosive devices, hoax devices, flammable or combustible materials for use in the construction of explosive or incendiary devices, explosive containers, detonation devices or materials used in the construction a fuse or lighting process, construction materials for hoax devices, records, ledgers, written or digital documents related to the purchase and or construction of prohibited explosive, incendiary, or hoax devices as well as computers, cellphones, or other digital media storage devices in which such documentation could be stored and if you find same, or any part thereof, to bring it forthwith before me at my office, in Jackson, of said County and State.

This 2ⁿᵈ day of June, 2020,

_____
JUDGE, CIRCUIT COURT
MADISON COUNTY, TENNESSEE

Judgement on Search Warrant
STATE OF TENNESSEE

vs.

Judgement that the items found under this
warrant to be delivered to the Chief of Police
Jackson, Tennessee.

This is the _____
_____ day of _____
20 _____

_____ Judge

---

**Official**

# SEARCH WARRANT

STATE OF TENNESSEE

vs.

Juida Wade Coleman (XXX, D.O.B. 08/24/1991, AKA Robert Cassidy)

1243 Whitehall lot # 4

Jackson, TN 38301

Delivered to _____ Major Phillip Kemper

for execution this _____ June _____ 2nd _____ day of
_____ 20  20 , at

10:31 _____ o'clock ____ A___ M.

_____ Judge

### OFFICER'S RETURN

Came to hand same day issued. Executed as
commanded by searching the within described
premises and the defendant on this the 2nd day
of June _____ 20 20 , at 1130 hrs.

_____ Officer

By reason of such search I found the following
described items:

3 laptop computers
2 handguns, 1 rifle & ammunition
5 drug paraphernalia
5 Cellphones
1 Go-Pro Camera
Misc. Clothing and pebbles

Which were taken before the Judge of The Court of
Madison County, Div. I.

This the 2nd day of June , 20 20

_____ Officer

JPD Form #261

---

### OFFICER'S RETURN

2 X box Game Consoles
1 Makelike Cocktail bottle
Hunting Knife
Canon digital Camera
2 Holsters
2 Anarchy paraphernalia
Marijuana

JC-000026

# EXHIBIT 3

