IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 1:20-cr-10048-STA |
| JUSTIN COFFMAN, | ) |
| Defendant. | ) |

**UNITED STATES' RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS**

COMES NOW the United States of America, by and through Joseph C. Murphy, Jr., Acting United States Attorney for the Western District of Tennessee, and Hillary Lawler Parham, Assistant United States Attorney, and responds to Justin Coffman's (hereinafter "Coffman" or "Defendant") motion to suppress as follows:

**FACTS**

The Defendant was charged with possession of two firearms while he was knowingly an unlawful user of a controlled substance by a Grand Jury in the Western District of Tennessee. RE 15. This indictment stems from the execution of a search warrant at the Defendant's residence[1], which was supported by an affidavit sworn to by Major Kemper of the Jackson Police Department, which shall be attached and incorporated herein by reference. *See* Attached Exhibit 1. While at the residence, Sgt. Donald and Sgt. Pinion of the Jackson Police Department *Mirandized* and Interviewed Coffman. Coffman admitted to officers that the AR15 rifle and SAR

---

[1] Pursuant to F.R. Crim.P. 49.1, the home addresses are intentionally redacted. However, for clarification purposes the subject of the search warrant will be referred to as "the Defendant's residence." The home addresses and personal identifying information have also been redacted in the attached Exhibit 1.

Arms pistol and marijuana found inside the residence were his. Coffman also admitted to smoking 1-2 grams of marijuana every day. This indictment followed. Coffman is also charged in Madison County Circuit Court in Case No. 20-7780 with Possession of a Hoax device in violation of T.C.A. § 39-17-1302; Possession of a Schedule VI (marijuana) in violation of T.C.A. § 39-17-418; and five counts of Possession of Drug Paraphernalia in violation of T.C.A. § 39-17-425; all stemming from the same set of facts as the instant case. In fact, it is the state indictment that led officers to the Coffman residence on June 2, 2020. However, it is important to note that a state of civil unrest and protest began on May 26, 2020, across the United States in response to the death of George Floyd on May 25, 2020. Over a three-night period, a five-mile stretch of Minneapolis, Minnesota sustained extensive damage from riots, looting and fire. The police precinct was set on fire and many locally owned businesses were destroyed by fire[2]. Similar riots arose across the country during this same time-period causing up to $1 billion in damages from May 26, 2020 until June 8, 2020[3].

This reminder of the events in the summer of 2020 put the information received by the affiant in context. On May 28, 2020, a local law enforcement officer observed the Defendant's post on Facebook. The three similar depictions in the Facebook post were of the Defendant standing in an alley near the Jackson City Court building facing a Jackson Police Department transport van. The Defendant was holding behind his back a glass bottle filled with a yellowish tan liquid and a rag inserted into the throat of the bottle fashioned to appear to be a Molotov Cocktail. The Defendant also had a lighter in his hand and was wearing a distinctive black leather

---

[2] Farrah Stockman, They Have Lost Control: Why Minneapolis Burned, The New York Times, Published July 3, 2020, updated Feb. 26, 2021, https://www.nytimes.com/2020/07/03/us/minneapolis-government-george-floyd.html. Last visited July 7, 2021.
[3] Kaelan Deese, Vandalism, looting following Floyd death sparks at least $1B in damages nationwide: report, Pub: September 16, 2020 at 03:43 PM EDT, The Hill. https://thehill.com/homenews/news/516742-vandalism-looting-after-floyd-death-sparks-at-least-1-billion-in-damages-report.

jacket with patches on the back and a black ball cap turned around backwards. The words printed on the hat were "BURN THE SYSTEM TO THE GROUND." The Defendant had a "Guy Fawkes[4]" mask slung over his shoulder. The Facebook post and the three photographs were captioned, "Was saving these pictures but now seems like a good time. 'You will bathe in the flames born from your hatred.'" *See* Exhibit 2



**Exhibit 2**

When Officer Wright observed this post on the Facebook page known as "The Gunpowder Plot," as well as, the page of a person identifying himself as Justin Coffman, she notified her supervisor, Sgt. Richardson. Sgt Richardson then disseminated a photo of the post to the Jackson Police Department officers in an "officer safety" email. By the next morning, Lt. Chestnut with the Jackson Police Department was able to confirm that the Facebook profile was operated by the

---

[4] A co-conspirator to Robert Catesby during the Gunpowder Plot. *See* History.com Editors, Gunpowder Plot. Originally posted November 9, 2009, updated June 7, 2019. https://www.history.com/topics/british-history/gunpowder-plot.

Defendant. Lt. Chestnut found an acquittance and asked the acquittance to pass along a message for the Defendant to contact Lt. Chestnut. The Defendant contacted Lt. Chestnut that afternoon confirming his identity in the photograph holding a "Molotov Cocktail," but claimed that the bottle only contained apple juice and was used to support his musical band.

Two days later there was a peaceful protest scheduled near the Old Hickory Mall in Jackson, Tennessee. Jackson Police Department provided public safety for the event. The event then changed locations to the downtown area near the Jackson City Hall and the Madison County Courthouse. While on patrol at these citizen lead events, two officers noticed Coffman from the photograph emailed to them in the officer safety email at both locations. It was noted by at least one of the officers at this event that the jacket worn by Coffman at this event had the "appearance of neo-Nazi / white supremacist type symbols on the jacket." *See* Exhibit 1, Page 2 of 5.

The radio transmissions between the two officers caused Major Kemper to go to the location and he observed Coffman get into a Nissan Altima, which was registered to Justin Coffman at the Defendant's residence, and drive away from the protest. The next morning Major Kemper observed a newspaper article in the Jackson Sun with what appeared to be the person he had thought was Justin Coffman. However, the newspaper article lists the man's name as Robert Catesby. Based upon all the information officers had received to this point, the officers then tried to determine who Robert Catesby may be and any connection to Justin Coffman.



Robert Catesby rides a onewheelie holding up a sign during the second day protest at Old Hickory Mall, in Jackson, Tenn., Sunday, May 31, 2020. Jackson protests the death of George Floyd, and many other prominent African Americans who were killed by police officers.
STEPHANIE AMADOR / THE JACKSON SUN

It was then Jackson Police Department Intelligence Analyst Webb informed Major Kemper about the connection between the Gunpowder Plot and Robert Catesby being a co-conspirator in the 17th century botched attempt to blow up the King of England and Parliament with barrels of gunpowder. Based upon the photographs posted to social media, the admission to the possession of an alleged "fake" Moltov Cocktail, the Defendants appearance at protests claiming the name of a 17th century conspirator in a plot to blow up a governmental body, Major Kemper continued surveillance on the Defendant's residence. Major Kemper observed the Maroon Altima the Defendant was observed leaving the protest in, parked in front of the Defendant's residence on two occasions prior to the search warrant. Major Kemper determined that Justin Coffman's driver's license showed the address listed as the Defendant's residence, as

well as the vehicle's registration. At that point, Major Kemper prepared the affidavit and presented the search warrant to Judge Morgan of the Madison County Circuit Court to search for evidence relating to a hoax device or otherwise actual improvised explosive incendiary device in violation of Tennessee Code Annotated Section 39-17-1302, which prohibits a person from intentionally or knowingly possessing, manufacturing, transporting, repairing or selling an explosive or an explosive weapon, …, or a hoax device. T.C.A. §§ 39-17-1302(a)(1) and (a)(5).

## DISCUSSION

**1. The Affidavit of Major Kemper sufficiently establishes probable cause.**

The U.S. Supreme Court has identified probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Determining whether probable cause exists is not an exact science, and judges are instructed to look at the totality of the circumstances and in a reasonable and common sense manner. The exact quantum of support required has frequently been described as a fair probability, but more than a mere suspicion, that such evidence will be discovered. As such, the court ordinarily accords great deference to a magistrate's determination and it will not reverse his decision if the record contains a substantial basis for his probable cause findings. *United States v. Asker*, 676 F.Appx 447 (6th Cir. 2017). Moreover, the "review of an affidavit and search warrant should rely on a 'totality of the circumstances' determination rather than a line-by-line scrutiny." *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001)(quoting *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) cert. denied 531 U.S. 907 (2000). "The probable cause requirement … is satisfied if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *United States v. Beasase*, 521 F.2d 1306, 1307 (6th Cir.

1975). Accordingly, "the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates* at 238.

Furthermore, "a magistrate's decision to grant a search warrant should only be reversed if it was arbitrarily exercised." *Greene*, 250 F.3d at 478. "The duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005) (citing *Gates*, 462 U.S. at 238-39). A finding of probable cause does not require an 'actual showing of such activity,' but instead, "requires 'only a probability or substantial chance of criminal activity…." *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (quoting *Gates* 462 U.S. at 244, n.13).

In the case at bar, the country was in a time of civil unrest where riots, looting, and burning was occurring in cities across the nation. The defendant posted a reference to such activities on his Facebook page and that photo was then shared by a Facebook page titled The Gunpowder Plot. At a protest in Jackson, the defendant gave a false name of Robert Catesby to the local newspaper, which was another reference to The Gunpowder Plot. The defendant confirmed to officers that he was in possession of what appeared to be a Molotov Cocktail but claimed it was apple juice. Based upon the totality of these circumstances, officers had probable cause to believe there would be evidence of either an explosive device or a hoax device within the confines of the defendant's home.

2. **Nexus**

The Defendant alleges because the Facebook Post took place outside the home, the warrant

lacks a sufficient nexus. Def. Mtn. to Supp. DE 28, PageID 55.

The nexus between the evidence sought and the place to be searched is established in Major Kemper's affidavit. *U.S. v. Carpenter*, 360 F.3d 591 (6th Cir. 2004) is relied upon by the defendant in his motion. *Carpenter* requires evidence of criminal activity and the relation of the residence to the activity, which is shown in Major Kemper's affidavit.

The object appearing to be a Molotov Cocktail posted to Facebook by Coffman was comprised of what appeared to be a glass bottle filled with a tan liquid with a rag placed down the throat of the bottle. When speaking to Lt. Chestnut, Coffman admitted he did in fact possess the item but that the contents were apple juice and he intended to use the photo to promote his musical band. These items are all common household items and given the illegal and suspicious nature of creating such a device it is prudent to both create and store such an item in an area in which the owner has control of the area and can secure it. A practical and common-sense evaluation of these facts by a reasonably prudent person makes clear that there is a "a fair probability that contraband or evidence of a crime will be found" in the home of the defendant. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

This case is distinguished from *Carpenter* in that Coffman actually lived in the house and prior to the swearing of the warrant admitted to law enforcement he was in possession of the Molotov Cocktail, which was the focus of the search.

The affidavit must suggest "that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought" and not merely "that the owner of the property is suspected of a crime." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *Zurcher v. Standford Daily*, 436 U.S. 547, 556 (1978)). "[W]hether a sufficient nexus has been shown to a particular location turns in part on the type of

crime being investigated, the nature of the things to be seized, the extent of the opportunity to conceal the evidence elsewhere, and the normal inferences that may be drawn as to likely hiding places." *United States v. Savocan*, 761 F.2d 292, 298 (6th Cir. 1985). *See also Williams*, 544 F.3d at 686-87 (noting that a court "is entitled to draw reasonable inferences about where evidence is likely to be kept, based upon the nature of the evidence and type of offense, and holding that it was reasonable to infer that a suspected drug dealer would keep evidence of his crime at his residence (citation omitted)). See also *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir. 1985) (holding that it was a reasonable inference that a bank robber would keep stolen currency in his residence despite the passage of more than two months between the time of the robbery and the search).

Once a search warrant has been issued, "great deference" is due when reviewing a judicial officer's determination of probable cause. *Trinity Indus., Inc., v. Occupational Safety and Health Review Comm'n*, 16 F.3d 1455, 1459 (6th Cir. 1994). The courts should not "invalidate a warrant by interpreting an affidavit in a hyper-technical, rather than a common sense, manner." *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991). In the instant case, the United States submits that the search warrant is proper under the totality of the circumstances. *United States. v. Kinison*, 710 F.3d 678 (6th Cir. 2013).

**3. Coffman has not made a preliminary showing that a *Franks* hearing is warranted nor has he demonstrated by a preponderance of evidence that the affidavit contained a knowingly or recklessly false statement, or omitted information, that was material to the probable cause determination.**

The Defendant alleges in his motion that the jacket suggests "a mischaracterization alleged to the Judge in the Affidavit." Def. Mtn. to Supp. DE 28, PageID 50.

In *Aguilar v. Texas*, 378 U.S. 108, 109 n.1 (1968), the Court noted "[i]t is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought

to the [issuing judge's] attention." There is, however, an exception to this general rule created by *Franks*. In *Franks*, the Supreme Court held that a court may have a hearing in which it considers evidence that was not before the issuing judge if the defendant can show that the affiant made a false statement or recklessly disregarded the truth in his affidavit. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). However, before such a hearing, the defendant must first make a substantial preliminary showing that a false statement, which was necessary to the finding of probable cause, was knowingly or recklessly included by the affiant in the warrant affidavit. *Id.* If the hearing is granted, the defendant must then establish by a preponderance of the evidence that, (1) "the allegation of perjury or reckless disregard is established . . . [and (2),] the affidavit's remaining content is insufficient to establish probable cause." *Id.* at 156; *United States v. Elkins*, 300 F.3d 638, 649 (6th Cir. 2002).

*Franks* also extends to circumstances in which an officer intentionally or recklessly omits evidence in a search-warrant affidavit that is critical to determining the existence of probable cause. *See United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc). "[T]o be constitutionally problematic, the material must have been deliberately or recklessly omitted and must have *undermined* the showing of probable cause." *Id.* at 596–97; *see also United States v. Duval*, 742 F.3d 246, 250-51 (6th Cir. 2014) (citing *Carpenter*). Notably, "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997). Thus, in the case of an alleged omission from an affidavit, a *Franks* hearing will be justified only in "rare instances." *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998). This is so because "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Id.* (citation omitted).

Coffman argues that the information contained in the affidavit is inaccurate. However, he did not make a preliminary showing that he was entitled to a *Franks* hearing. In fact, the government's position is that the affidavit is not wholly inaccurate. The officer told Major Kemper that there was the appearance of neo-Nazi/ white supremacist type symbols on the jacket. Depending on the distance from which the officer observed the label pin on the jacket and the environment the officer was observing the jacket in, it is very possible the officer believed there was a swastika on the Defendant's jacket. *See* Exhibit 3


*Exhibit 3*

The government further maintains that, apart from failing to make a preliminary showing of entitlement to a *Franks* hearing, the small portion of the affidavit regarding the "appearance of neo-Nazi / white supremacist type symbols on the jacket worn by the subject" was not material to a finding of probable cause. Absent the statement regarding the believed nature of the patches and pins on the jacket, there is still probable cause to believe the defendant possessed either an explosive device or hoax device. Notably there is a patch of what appears to be a Molotov Cocktail on the jacket. However, the statement of the appearance of the jacket served more as identification that the man present at the protest and quoted in the local paper was the same man from the

Facebook picture than it was a statement of neo-Nazi / white supremacist beliefs used to further probable cause.

**4.      Protected Speech Argument**

The Defendant argues that his Facebook post is protected by his First Amendment right to free speech.  Def. Mtn to Suppress.  DE 28, PageID 52.  However, the Defendant cites *Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827, 23 L.Ed. 2d 430 (1969) (which was a case where the defendant was convicted of violation the criminal syndicalism statute, which was found to be unconstitutional), *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228 (6th Cir. 2015) (which was a § 1983 action against the Sheriff's Department for limited the speech of the Plaintiffs at a rally) and *Nwanguma v. Trump*, 903 F.3d 604 (6th Cir. 2018) (which was a liability suit where the plaintiffs were seeking damages against the defendants for injuries sustained while at a rally in which they were exercising their First Amendment right) in support of this argument.  None of which have any relationship with statements the Defendant voluntarily placed on Facebook being used as evidence to determine probable cause.

The First Amendment to the United States Constitution ensure that "Congress shall make no law … abridging the freedom of speech…."  U.S. Const. amend. I, it does not preclude the government from charging individuals with speech-based crimes.  *United States v. Jeffries*, 692 F.3d 473, 478 (6th Cir. 2012) (citing *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970).  In striking the balance between the constitutional right to freedom of speech with the government's duty to 'protect[] individuals from the fear of violence, from the disruption that fear engender, and from the possibility that the threatened violence will occur,' the First Amendment requires, for charges based upon the speech (for example 18 U.S.C. § 875(c)) that the threat be a "true threat." *Jefferies*, 692 F.3d at 478 (citing *Watts v. United States*, 394 U..S. 705, 707, 89 S.Ct. 1399, 22

L.Ed. 2d 664 (1969)). However, in this case, the Defendant is not charged for his speech and he was not prohibited from posting his speech on Facebook. It was simply used as evidence for a Judge to determine whether there was probable cause that a Molotov Cocktail or a hoax device was likely to be found in the Defendant's residence. This would be akin to someone posting a photograph of a large cache of drugs or other contraband to their Facebook page with a caption indicating their intended purpose for the contraband.

5. **The information provided in the affidavit was not stale.**

The defendant contends that the information contained in the affidavit was stale because it took place five days after the Facebook post. DE 28, PageID 56.

However, "the function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to the magistrate." *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (quoting *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988). "[T]he question of staleness depends on the 'inherent nature of the crime.' *Spikes*, 158 F.3d at 923.

> Instead of measuring staleness solely by counting the days on the calendar, courts must also concern themselves with the following variables: 'the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), etc.'" *Id*.

However, "evidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Canan*, 48 F.3d 954, 958 (6th Cir. 1995).

> As these variables demonstrate, even if a significant period has elapsed since a defendant's last reported criminal activity, it is still possible that, depending upon the nature of the crime, a magistrate may properly infer that evidence of wrongdoing is still to be found on the premises. *See United States v. Greany,* 929 F.2d 523, 525 (9th Cir.1991) (holding information not stale even though an informant

> said that two years ago he had remodeled defendant's premises to allow him to grow marijuana on second floor, with the court emphasizing that the information showed "an ongoing criminal business of a necessarily long-term nature"); *see also United States v. Johnson,* 461 F.2d 285, 287 (10th Cir.1972) (stating the general principle that when "the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant").

*Spikes*, 158 F.3d 923-24.

Therefore, "where the criminal activity occurred in a 'secure operational base' the passage of time becomes less significant." *Id.*

In this case, the nature of a Molotov Cocktail or hoax device is that it is capable of being stored in its condition until used, and as discussed above, the nature of the device is such that it is likely to be stored in an area in which the defendant can maintain security and control. The home of the defendant is certainly a secure area in which the defendant has control and the nature of the evidence sought is such that the materials are not perishable and maintain their enduring utility to the holder until used. Given that the question of staleness is subject to the "inherent nature of the crime" it is reasonable to believe the defendant was currently in possession of evidence in support of the crime a mere 4 days after the phone conversation in which the defendant confirmed he possessed a hoax device and the day after he gave a false name linked to The Gunpowder Plot at a protest, in a time in which the nation was in turmoil with riots, looting, and burning of cities.

6. **The *Leon* Good Faith Exception**

Our Court of Appeals has explained the good-faith exception to the exclusionary rule as follows:

> Even if a search warrant is defective, the Court will not suppress evidence seized pursuant to such warrant if the seizure was based on reasonable, good faith reliance on the warrant. The Supreme Court explained the mechanics of the good faith exception:

> "[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making the determination, all of the circumstances-including whether the warrant application had previously been rejected by a different magistrate-may be considered." *Leon*, 468 U.S. at 922-23 n.23, 104 S.Ct. 3405. The rationale behind the exception is that the exclusionary rule is meant to deter unlawful police conduct. This policy of deterrence is not served by the exclusion of evidence seized in good faith by the police.
>
> On the other hand, the good faith exception does not apply in the following specific circumstances: "1) the supporting affidavit contained knowing or reckless falsity; 2) the issuing magistrate wholly abandoned his or her judicial role; 3) the affidavit is 'so lacking in probable cause as to render official belief in its existence entirely unreasonable;' or 4) where the officer's reliance on the warrant was neither in good faith nor objectively reasonable." *Frazier*, 423 F.3d at 533 (quoting *Leon*, 468 U.S. at 923, 104 S.Ct. 3405.

*United States v. Abboud*, 438 F.3d 554, 578 (6th Cir. 2006) (internal citations omitted). The defendant has presented no argument to negate application of this law.

Here, defendant claims the affidavit is lacking because it is a bare-bones affidavit. DE 28, PageID 57-58. "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable case, and [the Supreme Court has] thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." *Leon*, 468 U.S. at 914. "[T]he possession of a warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct, by assuring 'the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.' *United States v. Chadwick*, 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977). Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable cause determination has

been that so long as the magistrate had a 'substantial basis for … conclude[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331, 76 L. Ed. 2d 527 (1983). "If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Leon*, 104 S.Ct. at 3419-20 (quoting *United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975)). No such knowledge can be imputed to the affiant in this case.

A bare bones affidavit has been defined as one that states only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability and basis of knowledge." *Laughton*, 409 F.3d at 748 (citation omitted). A bare-bones affidavit is a conclusory affidavit, one that asserts "only the affiant's belief that probable cause existed." *United States v.Williams*, 224 F.3d 530, 533 (6th Cir. 2000) (citation omitted). It contains a mere "guess that contraband or evidence of a crime would be found." *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994), and is "completely devoid" of facts to support the affiant's judgment that probable cause exists, *Carpenter*, 360 F.3d at 595-96, or is "so vague as to be conclusory or meaningless." *United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005). An affidavit is not bare-bones if it contains "a minimally sufficient nexus between the illegal activity and the place to be searched to support an officer's good faith belief in the warrant's validity even if the information provided was not enough to establish probable cause." *Carpenter*, 360 F.3d at 596. If the reviewing court is "able to identify in the averring officer's affidavit some connection, regardless of how remote it may have been" …"some modicum of evidence, however slight, to

connect the criminal activity at issue and the place to be searched," then the affidavit is not bare-bones and official reliance on it is reasonable. *Laughton*, 409 F.3d at 749-50.

Most notably, here the defendant confirmed to Lt. Chestnut that he was in possession of a what he claimed to be a hoax device comprised of apple juice rather than a functional Molotov Cocktail. The defendant posted a photo of such and the photo was shared by a page titled The Gunpowder Plot. The defendant then gave a false name to the local newspaper, a suspicious behavior, when quoted at a protest, and that false name was linked to The Gunpowder Plot. This is hardly a bare bores affidavit devoid of any "modicum of evidence."

Assuming only for the sake of argument that the Court should conclude that the search warrant in this case was deficient, then the government avers that this Court should apply the rule of *Leon* to this case.

## **CONCLUSION**

For all of the foregoing reasons, it is respectfully requested that this Court deny defendant Coffman's motion to suppress.

        Respectfully submitted,

        JOSEPH C. MURPHY, JR.
        Acting United States Attorney

By:    */s/ Hillary Lawler Parham*
        HILLARY LAWLER PARHAM 025520
        Assistant United States Attorney
        109 South Highland, Suite 300
        Jackson, Tennessee 38301
        Telephone: (731) 422-6220
        Hillary.Parham@usdoj.gov

CERTIFICATE OF SERVICE

I, Hillary Lawler Parham, do hereby certify that a true and exact copy of the foregoing document has electronically submitted to all counsel of record via the Court's electronic filing system, on this the 8th day of July, 2021.

/s/Hillary Lawler Parham
HILLARY LAWLER PARHAM
Assistant United States Attorney